Filed 10/28/15  Taylor v. City of Colton CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| GAYLENE SINGLETARY TAYLOR, as Co-trustee, etc., | |
| | E058348 |
| Plaintiffs, Cross-defendants and Appellants, | (Super.Ct.No. CIVSS800216) |
| v. | OPINION |
| CITY OF COLTON, | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John M. Pacheco, Judge.  Affirmed in part and reversed in part.

Law Offices of Courtney M. Coates and Courtney M. Coates for Plaintiffs, Cross-defendants and Appellants.

Best Best & Krieger, Kira L. Klatchko and Irene S. Zurko for Defendant, Cross-complainant and Appellant.

1

This court previously addressed this case when it was at the anti-SLAPP stage of the proceedings. (*City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 757 [Fourth Dist., Div. Two].) The case is now at the summary adjudication stage. At the trial court, Gaylor W. Singletary (Singletary)[1] brought a Third Amended Complaint (TAC) for (1) promissory estoppel; (2) breach of contract; (3) declaratory relief; and (4) unjust enrichment. Defendant, cross-complainant and appellant City of Colton (the City) filed a First Amended Cross-complaint (FACC) for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) unfair business practices; (5) declaratory relief; (6) injunctive relief; and (7) indemnity.

Singletary owned real property in the City, near where Center Street may be extended. In 1992, Singletary sought to subdivide his property. As part of the subdivision plan, Singletary agreed to construct infrastructure for the property, such as water and sewer systems. In the late 1990s, Singletary bribed a member of the City's City Council in exchange for the councilmember influencing the City to approve a development plan (the Center Street Extension Project), which would result in the City constructing the infrastructure—the same infrastructure Singletary had agreed to construct. In 1999, the City Council approved a construction plan, which placed the

---

[1] On April 5, 2015, Gaylor W. Singletary passed away; we granted the motion for substitution of a party, substituting Gaylene Singletary Taylor, as Successor Co-trustee of GW Singletary Private Revocable Living Trust of October 27, 1998. For clarity and ease of reference, with no disrespect intended, we refer to Gaylor Singletary in the body of this opinion.

burden on the City to construct the infrastructure. In 2003, Singletary pled guilty to a charge of bribery. (18 U.S.C. § 666.)

Singletary's lawsuit sought to have the City held responsible for constructing the infrastructure along Center Street. The City's lawsuit sought to have Singletary held responsible for constructing the infrastructure. Singletary and the City brought motions for summary judgment, or in the alternative, summary adjudication. The trial court denied the motions for summary judgment, and proceeded on the alternative motions for summary adjudication.

The trial court found, in pertinent part, (1) the 1992 contract was the only contract between the City and Singletary; (2) Singletary was not a third party beneficiary to other agreements upon which he tried to rely; (3) Singletary was not obligated to reimburse the City for past infrastructure construction pursuant to a theory of unjust enrichment; and (4) Singletary's TAC was barred due to Singletary failing to petition the trial court for leave to file an untimely government claim (Gov. Code, § 946.6). Given the findings, the trial court entered judgment in favor of the City on Singletary's TAC, and in favor of Singletary on the City's FACC.

Both Singletary and the City have appealed. In his appeal, Singletary contends he was not required to petition the court for leave to file an untimely claim because the case is based on contract law, not tort law. Additionally, Singletary asserts the trial court erred by finding the City is not legally responsible to finish constructing the infrastructure because (1) the City is obligated by the 1992 contract and the law concerning selection of alternative acts (Civ. Code, § 1450); (2) the City gave

3

Singletary untimely notice of its decision to proceed with third party contractors; and (3) Singletary is a third party beneficiary of the different agreements the City entered. Singletary asserts this court should remand the matter back to the trial court for the trial court to determine (1) whether the City had constitutional and/or statutory authority to contract with Singletary to provide water and sewer connections; and (2) whether the City is estopped from denying an obligation to complete the infrastructure construction under the doctrine of promissory estoppel.

The City has filed a cross-appeal. The City raises four issues. First, the City contends the 1992 agreement is enforceable against Singletary. Second, the City asserts the issue of whether the City breached the 1992 contract in a manner that precludes recovery against Singletary is a factual issue that (1) cannot be decided as a matter of law, or (2) should have been decided in the City's favor. Third, the City contends there is a material factual dispute as to whether Singletary engaged in an unlawful business practice, was unjustly enriched, or otherwise obligated by equity to reimburse the City for its expenses in constructing the infrastructure. Fourth, the City asserts the trial court exceeded its authority by summarily adjudicating factual or legal issues that did not completely dispose of a cause of action. We affirm the trial court's ruling on the City's motion against Singletary's TAC. We reverse the trial court's ruling on Singletary's motion against the City's FACC.

# FACTUAL AND PROCEDURAL HISTORY

A.    SINGLETARY'S THIRD AMENDED COMPLAINT

The following allegations are taken from Singletary's TAC. In 1991, the City annexed approximately 680 acres of previously unincorporated land. The Center Street expansion area was within the annexed land. As part of the annexation application, the City presented a utility plan to the San Bernardino County Local Agency Formation Commission (LAFCO). The utility plan reflected the City would immediately, upon annexation, provide water, sewer, and electrical services, at the City's expense.

In June 1999, the City, the City of Riverside (Riverside), and Singletary negotiated regarding infrastructure improvements along Center Street. Riverside was involved because it owned land, known as Pellisier Ranch, adjacent to the planned extension of Center Street. As a result of the negotiations, in October 1999, Singletary and the City entered into a development agreement (the development agreement); the development agreement was approved by the City's City Council (the City Council). A city council agenda report from October 1999, reflected the City would extend the utility services along the planned extension of Center Street in order to "satisfy the 1991 agreements that obligated the City to provide municipal services to the annexed areas." The development agreement provided the City would (1) pave the northern half of Center Street, (2) install sewer and water lines, (3) install fire hydrants, and (4) install a gas line; and Singletary would procure easements for the City from the property owners along the planned Center Street expansion, in order to facilitate the infrastructure improvements.

As part of the development agreement, Singletary hired design engineers and contractors "to assist him in providing services to [the] City to facilitate the project." The City awarded a no-bid contract to Krieger & Stewart, Inc. to design and engineer the project; however, the City then awarded a contract to Singletary's engineer, in order to utilize that engineering company's plan for the project. Singletary acquired cost-free easements for the City from property owners along the planned Center Street expansion, in order to facilitate the project.

In June 2000, the City and Riverside agreed to share the costs of some of the infrastructure improvements. Also in 2000, the City's assistant city manager sent letters to property owners along the planned Center Street extension. In the letters, the City committed to providing water, sewer, and gas lines, and to pave the northern portion of Center Street. Included with the letters were easement documents and/or dedication statements for the property owners to complete.

In October 2006, the City awarded a contract to a pipeline contractor for the installation of water and wastewater lines as part of the Center Street expansion. In November 2006, the City awarded another contract for materials and supplies related to the water and sewer improvements. In 2007, the City performed a portion of the infrastructure improvements, including construction of a 16-inch water line, a 12-inch gravity sewer, and a 12-inch force main. However, property owners along the planned Center Street expansion remain unable to connect to the City's water and sewer systems, the northern portion of Center Street was not fully paved, and the gas line was not installed.

In June 2008, Riverside sued the City over alleged violations of the California Environmental Quality Act. The two cities engaged in settlement discussions. In June 2009, the two cities entered into a memorandum of understanding (MOU), in which the City agreed to construct a sewage pump station or other facilities to convey wastewater to the City's wastewater treatment facility. The pump station would serve Riverside's Pellisier Ranch property, along with the properties along the Center Street expansion as part of the Pellisier Ranch Specific Plan. Riverside agreed to allow property owners along the Center Street expansion to temporarily discharge their wastewater into Riverside's sewer system. The City agreed to construct a metering station upstream of the connection to Riverside's sewer system, and to pay Riverside a monthly service charge. The two cities agreed to share rights of ingress and egress granted in the easements by the property owners along the Center Street expansion.

In September 2009, the City sent Singletary a letter demanding that Singletary pay $408,398.70 for the infrastructure improvements already performed along the Center Street expansion. The City further demanded Singletary commence constructing infrastructure improvements. Singletary rejected the City's demands because the City had agreed to construct the improvements at its own expense through bonds. The City refused to pay for the improvements, which caused Singletary and other property owners along the Center Street expansion to pay for the improvements. The infrastructure improvements remain unfinished; the property owners were not connected to the sewer lines, the street was unpaved, and the gas line was not installed. Singletary spent $21,542.40 for pavement, curb, and gutter work. The estimated cost for paving

along Center Street was $137,195. The estimated cost of installing a gas line was $37,195.

On October 2, 2007, Singletary filed a government tort claim against the City on behalf of himself and other property owners along the Center Street expansion. The City found the claim to be untimely under a six-month statute of limitations, and returned the claim to Singletary. Singletary asserted the six-month limitation did not apply to contract claims. Singletary applied to have the City reconsider its conclusion that the claim was untimely. The City did not timely respond to Singletary's application for reconsideration.

In Singletary's TAC, his first cause of action was based upon promissory estoppel. Singletary asserted the City was estopped from denying it agreed to construct the infrastructure improvements. Alternatively, Singletary alleged the City made promises without intending to perform its obligations so as to procure free easements. Singletary's second cause of action concerned breach of contract. Singletary asserted he, and the other property owners along the planned Center Street expansion, were third party beneficiaries of the MOU (between the City and Riverside) and the contracts the City entered into to facilitate construction of the infrastructure. Singletary alleged the City breached its contractual obligations by failing to construct the infrastructure at its own expense.

Singletary's third cause of action was for declaratory relief. Singletary requested the trial court declare (1) a valid and enforceable contract existed between the City and the property owners along the planned Center Street expansion wherein the City was

responsible for constructing the infrastructure; (2) the construction must be completed within a reasonable time period; and (3) Singletary was entitled to damages for the City's construction delays. Singletary's fourth cause of action was based upon unjust enrichment. Singletary alleged the City obtained easements at no cost, as well as Singletary's services, which unjustly enriched the City.

Singletary sought damages; attorney's fees; costs; the declaration, detailed *ante*; an injunction requiring the City to complete the construction in a reasonable time period; the value of Singletary's services in procuring the easements; and any other relief deemed proper.

B.    THE CITY'S FIRST AMENDED CROSS-COMPLAINT

The following allegations are taken from the City's FACC. In 1992, Singletary sought permission from the City to subdivide his property. In order to subdivide the property, Singletary was required to construct infrastructure, such as water and sewer systems, as well as paving the street. In October 1992, Singletary and the City entered into a written agreement whereby Singletary could immediately subdivide his property, but construction of the infrastructure would be deferred until a future time of the City's choosing. The agreement was recorded in November 1992 in connection with one of Singletary's parcel maps.

In November 1997, James Grimsby (Grimsby) became a councilmember on the City Council. Singletary gave Grimsby cash in exchange for Grimsby influencing the City to pay for the infrastructure along the Center Street expansion. In 1999, the City Council voted to direct City staff to negotiate a development plan with Singletary,

9

known as the Center Street Extension project, and to enter into contracts with engineers, contractors, and material suppliers to construct the infrastructure. In 2003, Singletary pled guilty to one count of bribing Grimsby. (18 U.S.C. § 666.)

In 2009, the City discovered the 1992 subdivision agreement involving Singletary. City staff who had been involved with the 1992 agreement were no longer employed with the City, and the agreement "had long since been buried in the City's archives," such that it could not have been discovered in the course of a "regular search of the City's records." In August 2009, at a deposition, Singletary admitted signing the 1992 agreement.

The City had been unaware of the 1992 agreement when it constructed portions of the infrastructure. In September 2009, Colton demanded Singletary commence building the remaining unconstructed portions of the infrastructure and sought reimbursement for the already completed portions of the infrastructure. Singletary had actual and constructive notice of Colton installing the infrastructure due to Singletary's frequent communications with the City, Riverside, contractors, and material suppliers, and his visits to the construction site. The City did not give Singletary formal notice under the agreement that it was commencing construction, but formal notice "would have been superfluous and redundant" given the actual and constructive notice.

The City's first cause of action concerned breach of contract. The City alleged Singletary breached the 1992 agreement by rejecting the City's 2009 demand for Singletary to commence constructing the infrastructure. The City asserted damages would be an insufficient remedy, and therefore requested Singletary be required to

specifically perform the terms of the agreement. The City's second cause of action was based upon breach of the implied covenant of good faith and fair dealing. The City alleged Singletary breached the implied covenant by bribing Grimsby in an attempt to avoid his obligations under the 1992 agreement.

The City's third cause of action concerned unjust enrichment. The City asserted Singletary was allowed to subdivide his property and sell a portion of the subdivided property, without bearing the cost of the infrastructure improvements, which unjustly enriched Singletary. The City asserted Singletary should have been required to pay for the infrastructure improvements. The City's fourth cause of action was based upon unfair business practices. (Bus. & Prof. Code, § 17200.) The City asserted Singletary engaged in an unfair, unlawful, and fraudulent business practice by bribing Grimsby.

The City's fifth cause of action sought declaratory relief. The City requested the trial court declare (1) the 1992 contract was valid and enforceable; (2) the 1992 contract was not superseded by any of the City's subsequent acts or omissions; (3) the 1992 contract still required Singletary to construct the infrastructure; (4) Singletary was obligated to reimburse the City for the portion of the infrastructure already constructed by the City; (5) Singletary's obligations under the 1992 contract had not been altered by his sale of the property; (6) the City did not made a selection or election under Civil Code section 1450; (7) Singletary was directly liable for his breach of the 1992 contract; (8) Singletary had actual and constructive notice of the City constructing portions of the infrastructure; (9) the City's failure to formally notify Singletary that it was commencing construction was not a breach of the 1992 contract; (10) the failure to

11

formally notify Singletary would apply only to the infrastructure already constructed, and not to the infrastructure that still needed to be built; (11) the 1992 contract did not violate the City's Municipal Code or the Subdivision Map Act; (12) Singletary's bribery conviction barred Singletary from any monetary or injunctive relief; (13) Singletary lacked standing to sue as a third party beneficiary of any contract between the City and another party; and (14) Singletary's claims were time barred by the Tort Claims Act (Gov. Code, §§ 900 et seq.).

The City's sixth cause of action was a request for injunctive relief. The City asserted it was suffering irreparable harm due to Singletary's unlawful conduct. The City requested an injunction requiring Singletary to finish constructing the infrastructure and reimburse the City for the infrastructure already constructed. The City's seventh cause of action sought indemnification. The City alleged Singletary was obligated to indemnify the City for the costs it incurred in installing the infrastructure.

The City sought: (1) specific performance; (2) actual and consequential damages; (3) injunctive relief; (4) restitution; (5) indemnification; (6) declaratory relief; (7) costs; (8) attorney's fees; and (9) any other proper relief.

C.    SINGLETARY'S MOTION FOR SUMMARY JUDGMENT

In April 2011, Singletary filed a motion for summary judgment, or, in the alternative, a motion for summary adjudication. In the motion for summary adjudication, Singletary raised six issues.

12

### 1. *THE CITY'S SELECTION*

In the first issue, Singletary asserted the City was obligated to complete the infrastructure at its own expense because it chose to begin the work. Civil Code section 1450 provides, "The party having the right of selection between alternative acts must select one of them in its entirety, and cannot select part of one and part of another without the consent of the other party." Singletary asserted the 1992 contract gave the City the choices of (1) Singletary constructing the infrastructure before issuing building permits; (2) that Singletary agree to participate in a public utility improvement district for the installation of water and sewer improvements; (3) Singletary perform the construction work at his expense upon 30 days written notice; or (4) the City perform the construction work at its expense, with a right of reimbursement from Singletary.

Singletary asserted the City selected to perform the construction work at its expense, and therefore, cannot seek reimbursement from Singletary until the work is completed. Singletary contended the City could not seek money for future construction costs. As to this issue, the trial court denied Singletary's motion for summary adjudication.

### 2. *COVENANT*

In the second issue, Singletary asserted he did not owe a duty under the 1992 contract because he transferred ownership of the property and the duty was a covenant running with the land. Civil Code section 1462 provides, "Every covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land." Singletary asserted the 1992

13

contract expressly reflected, "it shall constitute a 'covenant running with the land' binding upon [Singletary's] successors." Singletary asserted he sold/transferred all interests in the subdivided property. As to this issue, the trial court granted Singletary's motion for summary adjudication.

### 3. *CONDITION PRECEDENT*

In the third issue, Singletary asserted the City failed to perform an express condition precedent of the 1992 contract. In particular, the City failed to provide Singletary 30 days written notice prior to incurring construction costs at Singletary's expense. Singletary asserted the 1992 contract provided the City would give Singletary 30 days written notice and an opportunity to perform the work at his own cost prior to the City commencing construction. As to this issue, the trial court granted Singletary's motion for summary adjudication because the City could not establish it provided notice to Singletary.

### 4. *UNJUST ENRICHMENT*

In the fourth issue, Singletary argued the City's unjust enrichment theory failed because the City did not provide Singletary with formal notice and thereby failed to perform an express condition precedent in the 1992 contract. Singletary asserted he "already sold his land before the work was performed in 2006-2007," and therefore, he was not unjustly enriched by the City's infrastructure improvements. As to this issue, the trial court granted Singletary's motion for summary adjudication.

14

### 5.    *UNENFORCEABLE CONTRACT*

In the fifth issue, Singletary asserted the 1992 contract was unenforceable because (1) it violated (a) the City's Municipal Code and (b) the Subdivision Map Act; and (2) it omitted statutorily mandated terms.  As to this issue, the trial court denied Singletary's motion for summary adjudication.

### 6.    *BRIBERY CONVICTION*

In the sixth issue, Singletary argued his bribery conviction did not void the City's annexation obligations or its contract with Riverside to construct the infrastructure.  The trial court granted the summary adjudication motion on this issue, but noted it was irrelevant because Singletary could not force the City to construct the infrastructure.

### 7.    *TRIAL COURT'S EXPLANATION*

The trial court summarized Singletary's position on the 1992 contract as asserting the City was bound by the 1992 contract to construct the infrastructure, but Singletary was not bound by the contract because (1) he no longer owned the relevant property; (2) the City did not provide Singletary 30 days written notice; (3) the 1992 agreement was unenforceable because it did not comply with the Municipal Code and other laws; and (4) the agreement runs with the land, and was not personal to Singletary.  The trial court found Singletary's argument was "not well taken," in that Singletary asserted the City was bound to construct the infrastructure, but Singletary was not bound to pay for the infrastructure.

15

D.    THE CITY'S MOTION FOR SUMMARY ADJUDICATION

In May 2011, the City filed a motion for summary judgment, or, in the alternative, a motion for summary adjudication.

1.    *FINANCIAL INTEREST*

The City's first argument was that Singletary's entire suit was barred by Government Code section 1090.  The section provides, "[C]ity officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members."  (Gov. Code, § 1090, subd. (a).)  The law further provides, "An individual shall not aid or abet a . . . city officer or employee in violating subdivision (a)."  (Gov. Code, § 1090, subd. (b).)  Government Code section 1092 provides, "Every contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein."

The City asserted that Singletary pled guilty to bribing Grimsby for the purpose of having Grimsby support the Center Street expansion project.  Therefore, Grimsby was financially interested in any contracts related to the Center Street expansion, and thus, those contracts were void.  As to this issue, the trial court denied the summary adjudication motion.

2.    *LACK OF AN ENFORCEABLE CONTRACT*

Second, the City asserted no enforceable contract, other than the 1992 contract, was formed between the City and Singletary.  The City asserted that a city council resolution to create a contract was not a contract.  The City noted it had a detailed

16

municipal ordinance concerning the creation of development agreements. The City argued Singletary could not demonstrate he had a development agreement with the City. As to this issue, the trial court granted the motion for summary adjudication.

### 3. *THIRD PARTY BENEFICIARY*

Third, the City contended Singletary's third party beneficiary claims failed because (1) the contracts did not identify Singletary as a third party beneficiary; (2) the documents Singletary was treating as contracts, such as a city council agenda report, were not contracts; and (3) the contract between the City and a construction company expressly reflected there were no intended third party beneficiaries to the contract. As to this issue, the trial court granted the motion for summary adjudication.

### 4. *GOVERNMENT CLAIM*

Fourth, the City asserted Singletary's third party beneficiary claims were barred because he did not include them in his government tort claim form (Gov. Code, § 945.4). Fifth, the City argued Singletary's suit was jurisdictionally barred due to his failure to petition the trial court to file an untimely claim (Gov. Code, § 946.6). As to these issues, the trial court granted the motion for summary adjudication.

### E. EFFECT OF THE RULING

When brought together, the trial court found (1) the only contract between the City and Singletary was the 1992 contract; (2) Singletary owed no duty to perform covenants running with the land under the 1992 agreement because he sold the Pellisier Street property; (3) the City failed to perform an express condition precedent by not providing Singletary 30-days written notice prior to incurring construction costs;

17

(4) Singletary was not a third party beneficiary under any other contract or document; and (5) Singletary's TAC was jurisdictionally barred because he failed to petition the court for leave to file an untimely claim (Gov. Code, § 946.6).

The effect of the findings would be that the 1992 contract was a valid contract; however, Singletary cannot successfully sue to enforce the 1992 contract because he missed jurisdictional deadlines, and the City cannot successfully sue to enforce the 1992 contract because Singletary sold his property. The trial court entered judgment in favor of the City on Singletary's TAC, and in favor of Singletary on the City's FACC.

## DISCUSSION

### I

### STANDARD OF REVIEW AND BURDEN OF PROOF

"[A] trial court may grant a motion for summary adjudication only when such motion 'completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty.' We conduct a de novo review of this matter to determine whether there is a triable issue of material fact associated with the causes of action . . . ." (*South Beverly Wilshire Jewelry & Loan v. Superior Court* (2004) 121 Cal.App.4th 74, 79.)

There are two burdens applicable to a motion for summary adjudication. The first is the burden of persuasion. A party moving for summary adjudication, "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to [summary adjudication] as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion

18

thereon. [Citation.] There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fns. omitted (*Aguilar*).)

"Thus, a plaintiff bears the burden of persuasion that 'each element of' the 'cause of action' in question has been 'proved,' and hence that 'there is no defense' thereto. [Citation.] A defendant bears the burden of persuasion that 'one or more element of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

The second burden concerns the production of evidence. "[T]he party moving for summary [adjudication] bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

"A burden of production entails only the presentation of 'evidence.' [Citation.] A burden of persuasion, however, entails the 'establish[ment]' through such evidence of a 'requisite degree of belief.'" (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) "A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.] No more is called for." (*Id.* at p. 851.)

## SINGLETARY'S APPEAL

A.    1999 THROUGH 2001 DOCUMENTS

1.    *EXISTENCE OF A CONTRACT—CITY'S BURDEN*

The City brought a motion for summary adjudication on Singletary's TAC.  The City argued the only enforceable contract between the parties was the 1992 agreement.  The City did not provide a copy of the 1992 agreement.  Rather than argue the validity of the 1992 contract, the City argued the invalidity of the documents upon which Singletary was relying.  Accordingly, we are examining whether the documents upon which Singletary relies created a contract or promise.

The City argued that Singletary only presented a mixture of letters, agenda reports, and city council minutes, which did not amount to a contract.  The City relied on case law reflecting a City's rules regarding contract formation must be followed in order for an action/document to be a municipal contract.  (*First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 667 [city's specific contract formation rules must be followed for enforceable municipal contracts].)

In support of its argument, the City provided the trial court with (1) the October 19, 1999, City Council agenda report, which reflected the City Council would consider approving a development plan with Singletary wherein the City would construct the infrastructure; (2) a letter from the City to a design company, reflecting that, at the October 19 meeting, the City Council awarded a contract to the design company for the design of the water and sewer infrastructure; (3) an October 2000 letter from the City to

Center Street property owners reflecting the City was "contemplat[ing]" constructing a water and sewer main, fire hydrants, and paved roads for the Center Street expansion, and that the City "agrees to provide the aforementioned improvements . . . in exchange for the required right-of-way dedications from property owners in the area"; and (4) a May 2001 City Council agenda report reflecting the council was to consider accepting the easements offered by property owners along the Center Street expansion. The City included a variety of other documents, such as the easements.

The City asserted former Colton Municipal Code section 18.58.080 governed the creation of development agreements, and the requirements of that section were not met by the foregoing documents. Pursuant to former Colton Municipal Code section 18.58.080(12)(b), a development agreement must state (a) the specific duration of the agreement, (b) the permitted uses of the property, (c) the density and intensity of use, (d) the maximum height and size of proposed buildings, and (e) the specific provisions for reservations or dedication of land for public purposes. Additionally, the development agreement must be recorded by the County Recorder within 10 days of the effective date of the agreement. (Former Colton Muni. Code, § 18.58.080(16)(a).)

The agenda reports and letters do not meet the requirements of a development agreement. The documents do not include the necessary information, and there is nothing reflecting any of it has been recorded. Accordingly, the City met its burden of establishing a prima facie case that it did not make an enforceable agreement with Singletary for the City to construct the infrastructure.

21

## 2.    *PROMISSORY ESTOPPEL—SINGLETARY'S BURDEN*

In Singletary's opposition to the City's motion for summary judgment, he asserted that a resolution by the City combined with the City's letters to property owners created a promise by the City to construct the infrastructure.  Singletary relied on promissory estoppel as legal support for his argument.  Typically, a city cannot be bound to a contract by estoppel.  (*First Street Plaza Partners v. City of Los Angeles*, *supra*, 65 Cal.App.4th at p. 669.)  The reasoning for this rule is that a municipality cannot avoid its contract formation requirements by relying on estoppel.  (*Ibid.*)  Despite this general rule, we will address Singletary's promissory estoppel theory.

"'Promissory estoppel is "a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced."'  [Citations.]  The elements of promissory estoppel are (1) a clear promise, (2) reliance, (3) substantial detriment, and (4) damages 'measured by the extent of the obligation assumed and not performed.'"  (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 692.)

Singletary asserts the City made a promise by (1) passing a resolution, and (2) sending the 2000 letter to property owners regarding the grant of easements to the City.  In the 2000 letter, the City explained that it had been in negotiations with Singletary and Riverside regarding improvements along Center Street.  The letter reflects, "As part of the negotiations, the City of Colton agrees to provide the aforementioned improvements including one domestic sewer connection, one domestic water connection up to two inches, and fire hydrants per city code, in exchange for the

required right-of-way dedications from property owners in the area. The Center Street project and its associated budget were approved by the City Council on May 2, 2000. The actual construction of the Center Street Project is contingent upon the delivery of the signed easements from all affected property owners and their acceptance by the City Council. This letter represents a testimonial to the City of Colton's commitment to providing essential public services to property owners in the Center Street area. If you concur with the exchange stipulated above please indicate by signing the attached grant of easement document."

The foregoing is in the nature of an offer; it is not a promise. An "offer must be certain and definite," hence the detail in the City's offer. (*Apablasa v. Merritt & Co.* (1959) 176 Cal.App.2d 719, 723.) The party to whom an offer is made must consent to the exact terms in order for a contract to exist. (*Id.* at p. 726.) In the 2000 letter, the City wrote, "If you concur with the exchange stipulated above please indicate by signing the attached grant of easement document." In that sentence, the City is asking for consent to an offer.[2]

In promissory estoppel, a promise is made when a party states it will perform a service or provide a good without consideration. (*US Ecology, Inc. v. State* (2005) 129 Cal.App.4th 887, 903.) The person expecting to receive the good or service need not provide anything in exchange, so that person's reliance becomes a substitute for the

---

[2] While we refer to this as an offer, we do so for ease of understanding. Ultimately, as explained *post*, there is no evidence the assistant city manager who signed the 2000 letter had authority to enter into contracts on the City's behalf.

consideration that would typically be present in a contract action. (*Id.* at pp. 903-904.) In the instant case, the City offered to construct infrastructure if the property owners agreed to provide easements. The City wanted consideration, i.e., the easements, therefore, the City did not make a promise.

In regard to the City passing a resolution, Singletary does not provide the language of the resolution. Rather, Singletary cites to three declarations, which discuss the 2000 letter. Since we have not been directed to the language of the resolution, we cannot determine if a clear promise has been made. (Cal. Rules of Court, rule 8.204(a)(1)(C) [support any reference with a record citation].) As a result, Singletary has not met his burden on this issue. We conclude the promissory estoppel theory fails.

3.      *BINDING AGREEMENT—SINGLETARY'S BURDEN*

Alternatively, Singletary asserted the agenda reports, city council meeting minutes, grants of easements, subcontracts, and correspondence from the City to property owners is evidence of a binding agreement. At oral argument in this court, Singletary cited Colton Municipal Code section 3.08.160 to support his point. That section provides, "Pursuant to the California Government Code, the Mayor must execute all contracts on behalf of the City, unless another City Officer or Employee is authorized to do so. The City Manager and his or her Designees, as explicitly set forth in this chapter and the administrative policies implementing this chapter, are hereby authorized to execute contracts on behalf of the City."

24

The 2000 letter from the City to homeowners, a portion of which is quoted *ante*, was signed by the assistant city manager. Thus, the mayor or the city manager was not a signatory to the letter. Singletary does not direct the court to where "in this [municipal code] chapter and the administrative policies implementing this [municipal code] chapter" (1) the assistant city manager is named as a designee, or (2) the procedure for how a person becomes a designee. (Colton Muni. Code, § 3.08.160.) We note the city manager, in a declaration, declared he approved the assistant city manager's act of sending the 2000 letter to property owners; however, Singletary has not established that this casual authorization is sufficient to create a "designee" authorized to execute contracts. There is a significant difference between authorization to send a letter and authorization/designation to sign a contract.

As a result, we conclude the assistant city manager is not a designee authorized to execute contracts on behalf of the City. Because the assistant city manager is not authorized to execute contracts, we conclude the agenda reports, city council meeting minutes, grants of easements, subcontracts, and correspondence from the City to property owners did not create a binding agreement.

4. *THIRD PARTY BENEFICIARY—SINGLETARY'S BURDEN*

Next, Singletary asserted he was an intended third party beneficiary of the contracts the City entered into with others to design and construct the infrastructure. The allegation of being an intended third party beneficiary was not raised in Singletary's government tort claim form. The only item attached to Singletary's government tort claim letter was the 2000 letter sent to homeowners—he did not attach

contracts involving the City and other parties concerning the design and construction of the infrastructure. Arguably, because the third party beneficiary theory involves an effort to premise liability on documents/contracts generated at different times than those described in Singletary's initial claim letter, the theory is barred. (See *Stockett v. Association of Cal. Water Agencies Joint Powers Ins. Authority* (2004) 34 Cal.4th 441, 447.)

However, in October 2009, after the City demanded Singletary construct the infrastructure pursuant to the 1992 agreement, Singletary sent the City a letter. In the 2009 letter, Singletary asserted the property owners along Center Street "are part of a class of intended third-party beneficiaries to the MOU and those prior agreements entered into by the City of Colton to facilitate those improvements." The TAC includes an allegation that Singletary and property owners along Center Street are "intended third-party beneficiaries of the MOU, dated June 2009, and those preceding contracts that were entered into by [the] City of Colton to facilitate the City's plan, design, and construction of the promised street and utility infrastructure improvements . . . ." Accordingly, because there was some notice given of the third party liability theory, we will address the substantive merits of the issue.

A third party may only enforce a contract that is "made expressly for the benefit of [the] third person." (Civ. Code, § 1559; *Southern California Gas Co. v. ABC Constr. Co.* (1962) 204 Cal.App.2d 747, 750.) "Expressly," in this context, is the negative of "incidentally"—the third party does not need to be specifically named. (*Gilbert Financial Corp v. Steelform Contracting Co.* (1978) 82 Cal.App.3d 65, 69-70.)

26

Singletary contends the City elected to construct the infrastructure under the 1992 agreement, and then, pursuant to the 1992 agreement, the City sought reimbursement from Singletary for that construction work. Singletary contends he is a "third party beneficiary under those contracts for which Colton sought reimbursement."

In Singletary's TAC he cites 11 documents that he alleges constitute contracts to which he is a third party beneficiary. The documents include things like agenda reports, the City's 2000 letter sent to property owners, and the easement grants. As explained *ante*, those documents do not constitute a contract. However, Singletary also cites to other documents, such as (1) a contract between the City and W.J. McKeever, Inc.; (2) a June 1, 2000, cooperative agreement between the City and Riverside; (3) a November 21, 2006, agreement between the City and Inland Water Works; (4) an October 17, 2006, agreement between the City and Merlin Johnson Construction, Inc.; and (5) a June 2009 Memorandum of Understanding between the City and Riverside.

The documents are not attached to the TAC. The documents are not cited in the third party beneficiary section of Singletary's Opposition to the City's Motion for Summary Judgment. In Singletary's Appellant's Opening Brief, he cites the June 1, 2000, cooperative agreement.

In reviewing the record, we found letters between the City and W.J. McKeever, Inc. The letters are from W.J. McKeever, Inc. and set forth the company's proposals for work. The letters are proposals, not contracts.

27

The June 2000 cooperative agreement entered into by the City and Riverside provides, "Nothing in this Agreement is intended to create duties or obligations to, or rights in, third parties not party to this agreement." Thus, the agreement expressly disavows any third party beneficiaries. We have not located the agreement between the City and Inland Water Works.

The agreement entered into by the City and Merlin Johnson Construction, Inc. for the installing a gravity sewer and sewer force main for Center Street reads, "There are no intended third party beneficiaries of any right or obligation assumed by the Parties." Accordingly, this agreement also expressly disavows third party beneficiaries.

The June 2009 Memorandum of Understanding between the City and Riverside does not include a provision about third party beneficiaries, but incorporates the "Agreement for Temporary Wastewater Treatment for a Portion of the City of Colton." The Agreement for Temporary Wastewater Treatment provides, "Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successor and assigns, . . . nor shall any provision give any third person any right of subrogation or action over or against any Party to this Agreement." Given that the Agreement for Temporary Wastewater Treatment was expressly incorporated into the Memorandum of Understanding, the Memorandum includes the disavowal of third party beneficiaries. (See generally *Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 790 [""""parties may incorporate by reference into their contract the terms of some other document""""].)

28

In sum, our examination of the record reflects that the documents upon which Singletary is relying either (1) are not contracts, or (2) are agreements that expressly disavow third party beneficiaries. Given the express language in the agreements, it cannot be concluded that the agreements were made for Singletary's benefit, such that he would be able to enforce the agreements as an intended third party beneficiary.

B.     CAUSES OF ACTION

Singletary's TAC included the following causes of action: (1) promissory estoppel; (2) breach of contract; (3) declaratory relief; and (4) unjust enrichment.

1.     *PROMISSORY ESTOPPEL*

We have explained, *ante*, that the promissory estoppel theory fails.

2     *BREACH OF CONTRACT*

In the breach of contract cause of action, Singletary is relying on a 1999 City Council Agenda Report. He also raises a third party beneficiary theory. The breach of contract cause of action fails because, as explained *ante*, the 1999 through 2001 documents do not constitute a contract. Also, as explained *ante*, the third party beneficiary theory fails because (1) it was not raised in Singletary's government tort claim letter; and (2) the documents upon which Singletary relies either (a) are not contracts, or (b) are agreements that expressly disavow third party beneficiaries.

3.     *DECLARATORY RELIEF*

In regard to declaratory relief, Singletary sought a declaration that (1) a valid contract exists wherein the City is liable to construct the infrastructure; (2) the City is required to complete the construction within a reasonable timeframe; and (3) Singletary

29

is entitled to damages caused by the City's delays in constructing the infrastructure. As explained *ante*, there is no evidence of a contract wherein the City is responsible for constructing the infrastructure. Accordingly, Singletary's declaratory relief cause of action fails because no such declaration could be made.

4.     *UNJUST ENRICHMENT*

As to the unjust enrichment cause of action, Singletary sought compensation for his act of obtaining easements for the City from property owners along the Center Street expansion. Singletary's government tort claim letter does not mention "unjust enrichment," but does include his act of procuring easements within the context of a contract theory, i.e., Singletary procured the easements as part of the contract created by the City's 2000 letter to property owners. In the letter, Singletary requested reimbursement for all costs related to the Center Street project.

In the City's motion for summary judgment, it did not present an argument specifically directed at Singletary's unjust enrichment cause of action. Rather, the City asserted the entire TAC was barred by Singletary's failure to petition the trial court for leave to file an untimely claim. (Gov. Code, § 946.6.) Instead of focusing on the timeline associated with filing a government claim, we choose to focus on the statute of limitations for a claim of unjust enrichment. (*In re Demillo* (1975) 14 Cal.3d 598, 601 [statute of limitations may be raised at any time].)

Unjust enrichment has a three-year statute of limitations. (Code Civ. Proc., § 338, subd. (d); *F.D.I.C. v. Dintino* (2008) 167 Cal.App.4th 333, 347-348.) The easements from property owners along the Center Street Expansion were granted in

30

March, April, and May 2001. An Agenda Report for a May 15, 2001, meeting recommends the City Council accept the easements. In Singletary's declaration, he asserts the easements were accepted during 2001 and 2002. Singletary filed his lawsuit in January 2008. Singletary's lawsuit was filed over five years after he worked on procuring the easements for the City. Singletary has missed the three year statute of limitations for his unjust enrichment cause of action. Accordingly, the cause of action fails.

### C. ARGUMENTS ON APPEAL

#### 1. *FILING A LATE CLAIM*

Singletary contends he was not required to petition the trial court for leave to file a late government tort claim because his causes of action were based on contract. We have explained *ante*, that Singletary's causes of action fail for different reasons. Accordingly, we do not address this issue because it is moot. (See *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214 [an issue is moot when no effectual relief can be provided].)

#### 2. *1992 CONTRACT*

Singletary contends, under the 1992 contract, that the City must follow through on its choice to perform the work itself. (Civ. Code, § 1450 [selection of alternative acts].) Singletary's TAC does not include a cause of action based upon the 1992 contract. The 1992 contract is not mentioned in the TAC. Accordingly, a discussion about the City's obligations under the 1992 contract is not relevant to resolving Singletary's appeal.

3. *REQUESTS*

Singletary asserts this court should remand the matter back to the trial court for the trial court to determine (1) whether the City had constitutional and/or statutory authority to contract with Singletary to provide water and sewer connections; and (2) whether the City is estopped from denying an obligation to complete the infrastructure construction under the doctrine of promissory estoppel.

We decline both of these requests. As explained *ante*, Singletary's causes of action have failed. Therefore, there is no purpose to the trial court considering the foregoing two issues.

D       CONCLUSION

In sum, all four causes of action fail. Therefore, we conclude the trial court properly granted what was effectively summary judgment, as opposed to summary adjudication, because the City met its burden of establishing there is not a triable issue of material fact in Singletary's case against the City.

**III**

**THE CITY'S CROSS-APPEAL**

A.       BACKGROUND

The City sought to enforce the 1992 agreement, wherein Singletary agreed to construct the infrastructure. The City cross-complained against Singletary for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) unfair business practices; (5) declaratory relief; (6) injunctive relief; and (7) indemnity.

32

Singletary moved for summary judgment or summary adjudication against the City's cross-complaint. In the motion, Singletary raised six arguments. First, Singletary asserted he was not liable for constructing the infrastructure because the obligation was a covenant running with the land, and Singletary no longer owned the relevant property. Second, Singletary asserted Colton had a duty to complete constructing the infrastructure after selecting the option of constructing the improvements itself. (Civ. Code, § 1450.)

Third, Singletary contended the City failed to perform an express condition precedent of the 1992 agreement—providing 30 days written notice to Singletary prior to incurring construction costs at Singletary's expense. Fourth, Singletary asserted he had no duty to reimburse the City under a theory of unjust enrichment. Fifth, Singletary contended the 1992 agreement was unenforceable because it violates the Subdivision Map Act and the Colton Municipal Code. Sixth, Singletary contended his bribery conviction did not void the City's preexisting obligations with respect to constructing the infrastructure.

B.   COVENANT RUNNING WITH THE LAND

We examine Singletary's assertion that he bears no liability under the 1992 agreement because the agreement constitutes a covenant running with the land.

1.   *LANGUAGE IN THE 1992 AGREEMENT*

The 1992 agreement provides, "This agreement shall constitute a recordable covenant running with the land and shall be binding upon the heirs, executors, administrators and successors and assigns of the parties hereto."

33

The 1992 agreement further provides, "In the event Singletary or successor in interest shall refuse or neglect to commence the installation of said improvements within one week after the aforesaid 30 days notice [to commence construction], or to finish the installation within a reasonable period of time, CITY may at its expense by separate contract or force labor accomplish the installation and construction of said improvements and Singletary or successor in interest shall be liable to CITY for its costs thereof including, but not limited to overhead, labor and material. Said liability shall be a lien on the real property described herein, as a condition of said parcel map."

2       *STATUTORY LAW*

a)      <u>Law</u>

Civil Code section 1461 provides, "The only covenants which run with the land are those specified in this Title, and those which are incidental thereto." "A covenant can run with the land under either [Civil Code] section 1462 or [Civil Code] section 1468." (*Self v. Sharafi* (2013) 220 Cal.App.4th 483, 488.)

b)      <u>Civil Code section 1462</u>

Civil Code section 1462 provides, "Every covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land." The 1992 agreement was created as part of Singletary subdividing his land. The agreement is not contained in a grant of an estate in real property. Accordingly, the agreement does not constitute a covenant running with the land under Civil Code section 1462.

34

c)      Civil Code section 1468

Civil Code section 1468 provides, "Each covenant, made by an owner of land with the owner of other land or made by a grantor of land with the grantee of land conveyed, or made by the grantee of land conveyed with the grantor thereof, to do or refrain from doing some act on his own land, which doing or refraining is expressed to be for the benefit of the land of the covenantee, runs with both the land owned by or granted to the covenantor and the land owned by or granted to the covenantee and shall . . . benefit or be binding upon each successive owner, during his ownership . . . ."

The City is not described as a landowner in the 1992 agreement. The agreement does not reflect it will benefit property owned by the City. Rather, the 1992 agreement provides that Singletary owns property in the City and Singletary consents to constructing infrastructure that would serve his property and "other property in the area." Thus, we conclude the agreement was not made by two landowners. Further, the agreement does not involve a grantor and grantee. As a result, the 1992 agreement does not constitute a covenant running with the land under Civil Code section 1468.

3.      *CASE LAW*

In *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, the Andersons wanted to operate a winery and keep llamas on their property. Some neighbors objected, asserting the activities were prohibited by the covenants, conditions, and restrictions (CC&Rs) on the Andersons' property. The Andersons contended the CC&Rs were unenforceable because they were not included in any deed to their property. (*Id.* at p. 348.)

35

The Supreme Court adopted the following rule: "If a declaration establishing a common plan for the ownership of property in a subdivision and containing restrictions upon the use of the property as part of the common plan is recorded before the execution of the contract of sale, describes the property it is to govern, and states that it is to bind all purchasers and their successors, subsequent purchasers who have constructive notice of the recorded declaration are deemed to intend and agree to be bound by, and to accept the benefits of, the common plan; the restrictions, therefore, are not unenforceable merely because they are not additionally cited in a deed or other document at the time of the sale." (*Citizens for Covenant Compliance v. Anderson*, *supra*, 12 Cal.4th at p. 349.)

In the instant case, the document is a contract, not a declaration. The difference between a contract and a declaration makes this case less like *Citizens*, and more like *Fresno Canal and Irrigation Company v. Dunbar* (1889) 80 Cal. 530 (*Fresno*). In *Fresno*, the plaintiff was a corporation engaged in diverting and supplying irrigation water. The plaintiff entered into a contract with a landowner, Roeding. The plaintiff sold Roeding a water right for a tract of real estate that Roeding owned. In the contract, the plaintiff agreed to construct a box or gate to convey water to the land, and Roeding agreed to construct a ditch from the box or gate to his land. Roeding agreed to pay $400 per year for the water being furnished to his land. The agreement reflected, "'It is covenanted that this agreement and the covenants therein contained, on the part of the party of the second part, run with and bind the land.'" (*Id.* at pp. 532-533.)

Roeding sold and conveyed the relevant land to Dunbar. The plaintiff sued Dunbar asserting Dunbar owed money under the contract because the contract constituted a covenant running with the land, which had been recorded on the property. (*Fresno*, *supra*, 80 Cal. at pp. 533-534.) The trial court found in favor of the plaintiff, entering a personal judgment against Dunbar and decreeing a lien for the amount due, ordering a sale of the property. (*Id.* at p. 534.)

On appeal, Dunbar argued that the contract did not create a covenant running with the land because it was not made in connection with a conveyance or transfer of land. (*Fresno*, *supra*, 80 Cal. at p. 534.) The Supreme Court agreed the contract did not create a covenant running with the land, but noted the contract was meant to bind the land. Thus, the court questioned whether the contract was meant to create a lien upon the land. The court concluded "it [is] perfectly clear from the language used that this was the intention of the parties." The court concluded the contract created a lien upon the land. (*Id.* at p. 535.) The Supreme Court held Dunbar was not personally liable for the water payment; rather, Dunbar purchased property that was subject to the lien. (*Ibid.*)

Typically, under the Subdivision Map Act, a subdivider who is responsible for constructing infrastructure would post a bond, deposit, instrument of credit, or lien on the property in order to secure the future construction. (Gov. Code, § 66499, subd. (a)(1)-(3).) A lien is a proper form of security when "the local agency finds that it would not be in the public interest to require the installation of the required

improvement sooner than two years after the recordation of the map." (Gov. Code, § 66499, subd. (a)(4).)

As set forth *ante*, the 1992 agreement does include language about a lien: "Said liability shall be a lien on the real property described herein, as a condition of said parcel map." The 1992 agreement also reflects the infrastructure need not be immediately constructed: "It is deemed unnecessary at this time for said site improvements to be so constructed and installed as part of said parcel map." Thus, the agreement reflects the infrastructure construction may be delayed for more than two years, which would make a lien a proper form of security. (Gov. Code, § 66499, subd. (a)(4).)

Under the Subdivision Map Act, a subdivision "may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map pursuant to section 66426, when five or more parcels are involved, or a parcel map pursuant to section 66428 when four or fewer parcels are involved." (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 997.)

In 1992, Singletary subdivided his property into three parcels, under Parcel Map No. 14405.[3] The evidence reflects that Singletary subdivided the property into fewer than four parcels, and the subdivision was recorded on a parcel map, which triggers the application of the Subdivision Map Act. (*Gardner v. County of Sonoma*, *supra*, 29

---

[3] In 1994, Singletary further subdivided the remainder parcel, which was recorded on Parcel Map No. 14631. It appears the parcel was divided into two lots. In 1998, Singletary again subdivided the remainder parcel into four parcels, which was recorded on Parcel Map No. 15145.

38

Cal.4th at p. 997; *Van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 565-566.)

Given (1) the Subdivision Map Act is applicable to Singletary's 1992 subdivision; (2) a lien is a typical method of providing security for improvements under the Subdivision Map Act (Gov. Code, § 66499, subd. (a)(4)); (3) the 1992 agreement uses the word "lien"; and (4) our Supreme Court held the contract in *Fresno* created a lien, rather than a covenant running with the land (*Fresno*, *supra*, 80 Cal. at p. 535), we conclude the 1992 agreement did not create a covenant running with the land, but did create a lien upon the property, which was recorded in San Bernardino County's official records. Thus, Singletary cannot avoid liability for constructing the infrastructure by virtue of the 1992 agreement being a covenant running with the land. Singletary is personally liable for constructing the infrastructure, although his performance is secured by land he no longer owns. Accordingly, summary adjudication should have been denied as to this theory.

C.    SELECTION OF ALTERNATIVE ACTS

Next, we address Singletary's assertion that Colton had a duty to complete constructing the infrastructure after selecting the option of constructing the improvements itself. (Civ. Code, § 1450.)

1.    *CONTRACT LANGUAGE*

The 1992 agreement provides, "In the event Singletary or successor in interest shall refuse or neglect to commence the installation of said improvements within one week after the aforesaid 30 days notice [to commence construction], or to finish the

39

installation within a reasonable period of time, CITY may at its expense by separate contract or force labor accomplish the installation and construction of said improvement and Singletary or successor in interest shall be liable to CITY for its costs thereof including, but not limited to overhead, labor and material. Said liability shall be a lien on the real property described herein, as a condition of said parcel map."

2.    *LAW*

Civil Code section 1450 reads, "The party having the right of selection between alternative acts must select one of them in its entirety, and cannot select part of one and part of another without the consent of the other party."

3.    *DISCUSSION*

Singletary asserts that because the City elected to construct the infrastructure at its own expense (although it ultimately did not finish the construction), the City chose between the two alternatives of (a) performing the work itself, and (b) Singletary performing the work.

Singletary's argument is not persuasive because he has not shown that, prior to the City's construction, he refused or neglected to perform the work after being given notice to perform, thus triggering the City's obligation to choose between two alternatives. Singletary asserts the City demanded he perform the construction work in 2009, and he rejected that demand in 2009. However, Singletary is relying on the City's construction contract with Riverside, entered into in 2005, as proof that the City chose the alternative of constructing the infrastructure itself. The City could not have chosen the alterative of constructing the infrastructure itself in 2005, when the event triggering

40

an election of alternatives did not occur until four years later, in 2009. The portion of the contract cited by Singletary does not provide for what shall/may occur if the City simply decides to construct the infrastructure on its own, without the condition precedent having occurred, i.e. Singletary's refusal or neglect to commence construction after notice is given by the City. Accordingly, summary adjudication should have been denied as to this theory because the selection of alternatives is inapplicable.

### D. WRITTEN NOTICE

Next, we address Singletary's contention that the City failed to perform an express condition precedent of the 1992 agreement—providing 30 days written notice to Singletary prior to incurring construction costs at Singletary's expense.

#### 1. *CONTRACT LANGUAGE*

"Upon 30 days written notice by CITY to Singletary or successors in interest to commence the construction and installation of said off-site and street improvements, namely Pellisier Street improvements and on site improvements 32 foot wide private road easement from Pellisier to remainder parcel as shown on Parcel Map 14405 he and or they will do so in accordance with plans and installation of said off-site improvements, he and or they will do so in accordance with plans and specifications approved by CITY according to code, ordinances and policies then applicable or in accordance with the aforementioned public utilities improvement district to accomplish said construction as expeditiously as reasonably possible. The construction and installation of said off-site and on-site improvements shall be at no cost whatsoever to CITY."

41

2.  *LAW*

"A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." (Civ. Code, § 1436.)

3.  *DISCUSSION*

There is nothing in the foregoing contract language about reimbursement. The foregoing language, upon which Singletary is relying, concerns Singletary performing construction work, and notice being a condition precedent to Singletary's performance of that construction work. There is no language about a condition precedent prior to the City performing work or the City seeking reimbursement. Since there is no relevant reimbursement language in the foregoing portion of the contract, it cannot be concluded on this evidence that the City was required to give Singletary notice prior to performing the work itself and/or seeking reimbursement. (See *Crawford v. France* (1933) 219 Cal. 439, 443 [evidence is admissible to prove any matter on which a contract is silent]; see also *American Industrial Sales Corp. v. Airscope, Inc.* (1955) 44 Cal.2d 393, 397 [same].) Accordingly, summary adjudication should have been denied as to this theory because it cannot be concluded on this evidence that notice was required prior to the City engaging in its own construction work.

On our own, we note the 1992 agreement includes a clause, which we have already quoted multiple times, with the following language: "In the event Singletary or successor in interest shall refuse or neglect to commence the installation of said improvements within one week after the aforesaid 30 days notice [to commence

42

construction], or to finish the installation within a reasonable period of time, CITY may at its expense by separate contract or force labor accomplish the installation and construction of said improvement and Singletary or successor in interest shall be liable to CITY for its costs thereof including, but not limited to overhead, labor and material. Said liability shall be a lien on the real property described herein, as a condition of said parcel map."

This clause also does not apply to the situation at hand. The situation being that, prior to 2009, the City commenced construction without giving notice to Singletary. The clause does not provide that the City may only seek reimbursement upon giving notice. Rather, it provides for what may occur if notice is given and Singletary declines to perform. The contract does not set forth a plan for what will occur in the current situation. For example, the contract does not read, "the City shall only seek reimbursement upon first having provided 30 days written notice to Singletary," thereby negating the possibility of the City obtaining a reimbursement without first providing notice. The contract simply does not cover the situation as it occurred in this case. Accordingly, we are not persuaded that giving notice is an express condition precedent that the City failed to perform prior to seeking reimbursement.

E.    UNJUST ENRICHMENT

Next, we examine Singletary's assertion that he has no duty to reimburse the City under a theory of unjust enrichment. Without citing any new contract language, Singletary contends the City failed to perform an express condition precedent, i.e., the City failed to provide Singletary notice prior to performing the construction work.

43

Singletary reasons that because the City did not perform the express condition precedent, it cannot prevail on a theory of unjust enrichment.

Unjust enrichment does not lie where an express binding agreement is in place. (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 172.) As explained *ante*, the contract clause cited by Singletary is silent concerning the City performing the construction work and/or seeking reimbursement. Because Singletary has not cited evidence of a binding agreement concerning the City's performance of construction work and/or concerning the City seeking reimbursement, his theory related to unjust enrichment is unpersuasive— because one could possibly find there is not a contract on this point, unjust enrichment could perhaps be applicable.

Also, the clause this court raised on its own does not address the situation created in this case—where the City seeks reimbursement without first notifying Singletary to commence construction. Because the contract does not expressly include this situation, it is possible the City could prevail on a cause of action for unjust enrichment—one could perhaps find there is not a binding agreement for this situation thus triggering the application of unjust enrichment. Accordingly, summary adjudication should have been denied as to this theory.

F.    VIOLATIONS AND OMISSIONS

Next, we address Singletary's contention that the 1992 agreement is unenforceable because it (1) violates the Subdivision Map Act; (2) violates the Colton Municipal Code; and (3) omits statutorily mandated terms.

44

1. *REIMBURSEMENT*

    a)    <u>Law</u>

    (1)    *Subdivision Map Act*

The Subdivision Map Act provides, "There may be imposed by local ordinance a requirement that improvements installed by the subdivider for the benefit of the subdivision shall contain supplemental size, capacity, number, or length for the benefit of property not within the subdivision, and that those improvements be dedicated to the public. Supplemental length may include minimum sized offsite sewer lines necessary to reach a sewer outlet in existence at that time." (Gov. Code, § 66485.)

It further provides, "In the event of the installation of improvements required by an ordinance adopted pursuant to [Government Code] Section 66485, the local agency shall enter into an agreement with the subdivider to reimburse the subdivider for that portion of the cost of those improvements, including an amount attributable to interest, in excess of the construction required for the subdivision." (Gov. Code, § 66486.)

Additionally, the Subdivision Map Act reflects, "In order to pay the costs as required by the reimbursement agreement, the local agency may: [¶] . . . [¶] (c) Establish and maintain local benefit districts for the levy and collection of such charge or costs from the property benefited." (Gov. Code, § 66487.)

    (2)    *Colton Municipal Code*

The Colton Municipal Code reads, "Pursuant to Section 66485 of the Subdivision Map Act, the Subdivider May be required to install Improvements for the benefit of the Subdivision which May contain supplemental size, capacity or number for the benefit of

Property not within the Subdivision as a condition precedent to the Approval of a Subdivision or Parcel map, and thereafter to dedicate such Improvements to the public. However, the Subdivider Shall be reimbursed for that portion of the cost of such Improvements equal to the difference between the amount it would have cost the Subdivider to install such Improvements to serve the Subdivision only and the actual cost of such Improvements pursuant to the provisions of the Sections [*sic*] 66486 and 66487 of the Subdivision Map Act. Such reimbursement Shall be accomplished by the provisions of an agreement by and between the Subdivider and the City." (Colton Muni. Code, § 16.56.020.)

b)      Discussion

Singletary contends that because the 1992 agreement does not include a provision for reimbursing him for public improvements, the agreement violates the Subdivision Map Act and the Colton Municipal Code, which require terms related to reimbursement.

The 1992 agreement includes language about offsite improvements. The offsite improvements relate to water and sewer improvements. Therefore, arguably, Singletary agreed to perform work that would benefit property not within the subdivision—it is also possible the offsite improvements would only benefit the subdivision, but both interpretations are possible from the contract language. As a result, we will assume the reimbursement rules are applicable.

46

Notably, the 1992 agreement contains the following clause: "Singletary or successors in interest agree to the formation of a public improvement utility district for permanent water and sewer system, and agree to be a party to the public improvement utility district which includes Singletary or successors [in] interest paying a proportionate share of the public improvement utility district costs."

Thus, it appears from the 1992 agreement that Singletary and the City chose for Singletary to pay only his portion of the improvement costs via the establishment and maintenance of a "local benefit district[] for the levy and collection of such charge or costs from the property benefited." (Gov. Code, § 66487, subd. (c).) Because the agreement includes language about Singletary only paying his portion of the costs, we conclude the rules requiring a reimbursement clause were not violated.

2. *NECESSARY IMPROVEMENTS*

a) Law

As set forth *ante*, the Subdivision Map Act provides, "There may be imposed by local ordinance a requirement that improvements installed by the subdivider for the benefit of the subdivision shall contain supplemental size, capacity, number, or length for the benefit of property not within the subdivision, and that those improvements be dedicated to the public. Supplemental length may include minimum sized offsite sewer lines *necessary* to reach a sewer outlet in existence at that time." (Gov. Code, § 66485, italics added.)

b)    Discussion

Singletary contends the 1992 agreement violates Government Code section 66485 because the supplemental length for the sewer lines was not necessary for reaching the sewer outlet.  In support of this assertion, Singletary cites a portion of the 1992 agreement which reads, "It is deemed unnecessary at this time for said site improvements to be so constructed and installed as part of said parcel map."  This language does not support Singletary's assertion that there is a violation.  The language does not reflect that any supplemental length is unnecessary for reaching the sewer outlet.  Rather, the wording provides that none of the infrastructure improvements need to be immediately constructed.

This interpretation is supported by the clause following the portion cited by Singletary.  The clause that follows the cited language reads, "CITY desires to continue its right to require the installation and construction of said off-site improvements, in the future, the exact date of which is uncertain, but it is contemplated that said improvements may coincide with further or other development upon said real property or property contiguous thereto or nearby, and by the formation of a public improvement utilities district."  Thus, it appears the construction was unnecessary because no development was occurring in the area at the time of the agreement in 1992.  There is nothing reflecting the supplemental length was unnecessary for reaching the sewer outlet.  Accordingly, we conclude Singletary's argument fails on this point.

3. *SPECIFIED TIME*

    a)    <u>Contract Language</u>

As set forth *ante*, the 1992 agreement reads, "CITY desires to continue its right to require the installation and construction of said off-site improvements, in the future, *the exact date of which is uncertain*, but it is contemplated that said improvements may coincide with further or other development upon said real property or property contiguous thereto or nearby, and by the formation of a public improvement utilities district." (Italics added.)

Further, the 1992 agreement provides, "Upon 30 days written notice by CITY to Singletary or successors in interest to commence the construction and installation of said off-site and street improvements, namely Pellisier Street improvements and on site improvements 32 foot wide private road easement from Pellisier to remainder parcel as shown on Parcel Map 14405 he and or they will do so in accordance with plans and installation of said off-site improvements, he and or they will do so in accordance with plans and specifications approved by CITY according to code, ordinances and policies then applicable or in accordance with the aforementioned public utilities improvement district to *accomplish said construction as expeditiously as reasonably possible*." (Italics added.)

    b)    <u>Law</u>

    (1)    *Colton Municipal Code*

The Colton Municipal Code provides, "If such Improvement work is not completed satisfactorily before the final or Parcel map is Approved, the Subdivider

49

*Shall be required to enter into an agreement with the City whereby said Improvements Shall be completed within a specified time.* To assure that such work will be accomplished, the Subdivider Shall furnish to the City security as described in this chapter." (Colton Muni. Code, § 16.56.030 [italics added].)

(2) <em>Statutory Law</em>

Government Code section 66411.1, subdivision (b), provides, "Notwithstanding Section 66428, fulfillment of the construction requirements shall not be required until the time a permit or other grant of approval for development of the parcel is issued by the local agency or, where provided by local ordinances, until the time the construction of the improvements is required pursuant to an agreement between the subdivider and the local agency . . . ."

(3) <em>Municipal Contracts</em>

In regard to municipal contracts, case law provides, "'Certain general principles have become well established with respect to municipal contracts . . . . The most important one is that contracts wholly beyond the powers of a municipality are void. They cannot be ratified; no estoppel to deny their validity can be invoked against the municipality; and ordinarily no recovery in quasi contract can be had for work performed under them. It is also settled that the mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable.'" (*Miller v. McKinnon* (1942) 20 Cal.2d 83, 88.)

(4)     *Lack of Specified Time*

In relation to contracts in general, statutory law provides, "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed.  If the act is in its nature capable of being done instantly—as, for example, if it consists in the payment of money only—it must be performed immediately upon the thing to be done being exactly ascertained."  (Civ. Code, § 1657.)

c)     Discussion

The 1992 agreement does not include a specific time by which the construction work must be completed, e.g., by March 2005 or within 365 days.  Singletary asserts the failure to include a specific completion time causes the contract to be unenforceable because it exceeds the City's contracting authority by violating the City's municipal code.  The City asserts the contract terms meet the requirements of Government Code section 66411.1.

To resolve this issue we must interpret the statute.  When interpreting a statute, we begin by examining the statute's plain language.  If the wording is clear and unambiguous, then our inquiry ends.  (*Piscioneri v. City of Ontario* (2002) 95 Cal.App.4th 1037, 1043 [Fourth Dist., Div. Two].)

For reference, as set forth *ante*, the statute provides, "Notwithstanding Section 66428, fulfillment of the construction requirements shall not be required until the time a permit or other grant of approval for development of the parcel is issued by the local agency *or*, where provided by local ordinances, until the time the construction of the

51

improvements is required pursuant to an agreement between the subdivider and the local agency . . . ." (Gov. Code, § 66411.1, subd. (b), italics added.)

"'[U]se of the word "or" in a statute indicates an intention to use it disjunctively so as to designate alternative or separate categories.'" (*Piscioneri v. City of Ontario*, *supra*, 95 Cal.App.4th at p. 1044.) Government Code section 66411.1, subdivision (b), provides construction requirements need not be fulfilled until (1) a development permit is issued; or (2) if a local ordinance is in effect, then by the time required in an agreement between the subdivider and local agency. The statute creates alternatives by the use of the word "or." The local ordinance option does not take precedence over the "development permit" option—there are two alternatives set forth in the statute.

In the 1992 agreement, Singletary and the City selected the development permit option. The 1992 agreement reflects, "it is contemplated that said improvements may coincide with further or other development upon said real property or property contiguous thereto or nearby, and by the formation of a public improvement utilities district." This language establishes that the construction requirements will need to be fulfilled in connection with development permits being issued, as set forth in Government Code section 66411.1, subdivision (b). Accordingly, the 1992 contract falls within the City's contracting authority. Thus, summary adjudication should have been denied as to this theory.

G.    BRIBERY CONVICTION

Singletary's final contention in his motion for summary adjudication is that his bribery conviction did not void the City's preexisting obligations with respect to constructing the infrastructure.  The obligations to which Singletary refers are those allegedly created by (1) the City's 1991 annexation agreement, and (2) the 2005 and 2009 agreements with Riverside.

This issue does not assist with resolving a motion for summary adjudication.  If the City has obligations and those obligations are unaffected by Singletary's bribery conviction, then it would seem there are triable issues of fact, i.e., whether the City is obligated to construct anything, whether the City has met its obligations, etc.  Because this issue appears to create triable issues of fact, rather than resolve them, we do not address it further.  Summary adjudication should have been denied as to this theory.

H.    CONCLUSION

The trial court erred by granting Singletary's motion for summary adjudication, or what was effectively summary judgment.  Singletary's motion against the City's First Amended Cross-Complaint should have been denied.[4]

---

[4] The City requests this court take judicial notice of a November 14, 2012, e-mail from the trial court that contains the trial court's rulings on evidentiary objections.  We grant the request as required by law.  (Evid. Code, §§ 452, subd. (c), 453.)

## **DISPOSITION**

The judgment on the City's motion, against Singletary's Third Amended Complaint, is affirmed.  The judgment on Singletary's motion, against the City's First Amended Cross-Complaint, is reversed.  The City is awarded its costs on appeal and cross-appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                                                                        J.


We concur:


KING
             Acting P. J.


CODRINGTON
                         J.